197 N.J. Super. 175 (1984)
484 A.2d 356
ELL-DORER CONTRACTING COMPANY AND HUFF CONSTRUCTION COMPANY, PLAINTIFFS-RESPONDENTS,
v.
STATE OF NEW JERSEY, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT,
v.
TOWNSHIP OF WOODBRIDGE, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 1984.
Decided November 19, 1984.
*176 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
Barbara A. Cohen, Deputy Attorney General, argued the cause for appellant (Irwin I. Kimmelman, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Barbara A. Cohen on the brief).
Robert D. Campbell argued the cause for plaintiffs-respondents (Boehm & Campbell, attorneys; Robert D. Campbell on the brief).
No brief was filed on behalf of third-party defendant-respondent.
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before the court on appeal in a nonjury action from a judgment dated August 12, 1983 awarding plaintiffs Ell-Dorer Contracting Company and Huff Construction Company $5,565 from defendant State of New Jersey and dismissing the State's third-party complaint against the Township of Woodbridge. H. Thomas Carr Associates was also a defendant in the trial court but at oral argument we were advised that no claims are now being asserted against it and consequently we no longer treat it as a party. We conclude that the action against the State should have been dismissed and consequently we reverse the judgment against it.
This matter originated when Woodbridge hired H. Thomas Carr to develop construction plans for improvements and construction *177 of Blair Road in Woodbridge. In February 1976 Woodbridge submitted an application to New Jersey Department of Transportation (D.O.T.), Bureau of Local Federal Aid Programs, for federal aid funding for the project. After approval of the application, the State and Woodbridge in October 1977 entered into a contract pursuant to which the D.O.T. then took over the project from Woodbridge and thus terminated Carr's responsibility.
Inasmuch as the construction work was to be performed by an independent contractor the State prepared a bid form proposal and advertised for competitive bids. The contract was to include site clearing, excavation, roadway construction, paving and landscaping. The bid form itemized 82 items of work including item 8, "Roadway Excavation, Unclassified." The form included "Approximate Quantities" for many of the items and thus unit and extended prices were sought. The extended prices were computed by multiplying the approximate quantities by the unit prices. The approximate quantity for item 8 was 19,948 cubic yards. Ell-Dorer was the successful bidder for the total price of $1,622,698.30. It properly supplied unit and extended prices including $7 per cubic yard and $139,636 on item 8. The State and Ell-Dorer entered into a contract for the project on January 12, 1979. The contract required Ell-Dorer to perform the work in compliance with plans on file at the D.O.T. and in accordance with the provisions of the 1961 Standard Specifications for Road and Bridge Construction of the State Highway Department, as amended by Supplementary Specifications.
In March 1979 plaintiff Huff learned that Ell-Dorer was interested in subcontracting out the excavation work specified in item 8. After Huff reviewed the plans it made a bid to Ell-Dorer for the subcontract. Ell-Dorer and Huff on April 6, 1979 entered into a subcontract agreement providing for Huff to do excavation work at the rate of $4.75 per cubic yard, for a total of $94,753. The 1961 standard specifications required the *178 State's consent to the subcontract. But article 1.3.7 indicated in part:
The consent to sublet any part of the work shall not be construed to be an approval of the said subcontract or of any of its terms, but shall operate only as an approval of the Contractor's request for the making of a subcontract between the Contractor and his chosen subcontractor.
On April 6, 1979 Ell-Dorer submitted a request for approval of the subcontract limited to 13,202 cubic yards of roadway excavation rather than the approximate quantity of 19,948 shown on the bid form. By so confining the request the value of the work under the prime contract being subcontracted was kept under $100,000. This was significant for Huff was not a prequalified bidder with the State and under State procedures was not authorized to perform work on the contract with a value over that amount.
The record is not clear as to how the 13,202 cubic yard quantity was determined. Charles Kolb, project manager for Ell-Dorer, indicated that a subbase quantity of 6,746 cubic yards for item 10 was subtracted from the approximate quantity of 19,948 cubic yards on item 8 to reach the 13,202 figure. However John Dorer, secretary-treasurer of Ell-Dorer, testified that he did not know the reason for the use of the 13,202 cubic yard quantity on the request form. John Helmer, resident engineer for the D.O.T. on the project was uncertain if the 19,948 roadway excavation quantity included the subbase. Nevertheless he concluded that it would probably have been assumed that the subbase was included in the 19,948 quantity. In any event on May 22, 1979 Ell-Dorer's request for approval of the Huff subcontract was granted for 13,202 cubic yards at the unit price of $7 per cubic yard, a total of $92,414.
Not long after execution of the prime contract the State became aware of a discrepancy in the quantity of excavation. This matter was discussed at a preconstruction meeting held by D.O.T. on February 7, 1979. To determine the extent of the discrepancy the D.O.T. made a survey resulting in a measurement requiring a net reduction of 1,005 cubic yards. In April the State so advised Huff and on June 6, 1979 the D.O.T. issued *179 a change order reducing item 8 by 1,005 cubic yards. Huff received a copy of the order.
Huff completed the excavation in August 1979. The final quantity of roadway excavation was measured at 12,407 cubic yards. Thus the State paid Ell-Dorer for 12,407 cubic yards at the unit price under the contract, $7, a total of $86,849. Ell-Dorer paid Huff for 12,407 cubic yards at their subcontract price, $4.75, a total of $58,933.25. Huff conceived that it had been injured by not being paid for the originally specified approximate quantity of cubic yards.
Pursuant to the procedure followed in Buckley & Co., Inc. v. State, 140 N.J. Super. 289, 319-322 (Law Div. 1975),[1] plaintiffs then brought this action for damages against the State. The State brought a third-party complaint against Woodbridge for indemnification.
Much of the testimony focused on responsibility for establishment of the 19,948 cubic yard roadway excavation quantity. Carr was consulting engineer on the project. He had prepared preliminary plans which he submitted to the D.O.T. for review. A preliminary earthwork summary prepared by his office indicated a roadway excavation quantity of 8,726 cubic yards and a summary of earthwork calculations prepared by Carr showed 8,800 cubic yards of excavation. Carr submitted these materials to the State. But a print of the earthwork summary of the final plans also prepared by his office showed a quantity of 19,948 cubic yards. Carr, however, denied placing this quantity on the sheet. He stated that although the print showed 19,948 cubic yards, the final plans he prepared did not show that amount. He stated that proper calculations from the cross sections showed the total cubic yardage equaled 8,800, the amount he estimated, rather than 19,948.
The State contended it was not responsible for the 19,948 quantity. It produced evidence showing that Woodbridge's *180 application for federal aid funding indicated an approximate quantity of 19,000 cubic yards for excavation.
Plaintiffs' legal position was that the State warranted 19,948 cubic yards of roadway excavation, a figure on which they relied in bidding. But the State contended that under its contract with Ell-Dorer it was not liable for the discrepancy. It claimed that plaintiffs had the obligation to inspect site conditions and it made no warranties. The State further asserted that the specifications excused it from liability.
The trial judge decided the matter in an oral opinion on August 4, 1983. While he did not make a clear finding as to the reason for the mistake in the approximate quantity of excavation required, he held that the State represented that there were at least 13,202 cubic yards of excavation, the amount it approved for subcontracting, and that it was liable for the deficiency. He thus regarded the case as involving a misrepresentation. He further found no provision in the contract that excused the State from liability. In reaching this result the judge discussed Sasso Contracting Co. v. State, 173 N.J. Super. 486 (App.Div. 1980), certif. den. 85 N.J. 101 (1980) and Golomore Associates v. N.J. State Highway Auth., 173 N.J. Super. 55 (App.Div. 1980). In view of our result we need not discuss the judge's method of calculation of damages beyond indicating it required the State to pay for excavation not done. In addition he dismissed the State's claims against Carr and Woodbridge. An order for judgment was entered on August 12, 1983 reflecting the opinion and the State has appealed from the judgment.
On this appeal the State argues that various articles of the standard specifications, including articles 1.2.11, 1.2.12, 1.2.5 and 1.8.5, precluded the imposition of liability in this action. Articles 1.2.11 and 1.2.12 are the disclaimer provisions considered in Sasso Contracting Co. v. State, supra, 173 N.J. Super. at 486.
In Sasso and Golomore Associates v. N.J. State Highway Authority, supra, 173 N.J. Super. at 55, contractors brought *181 suit for damages incurred because of false statements or inaccuracies in contract drawings, plans or specifications upon which they relied in preparing their bids. In Golomore the contractors were allowed damages resulting from incorrect elevations shown on contract drawings. The elevations were depicted in the drawings as higher than turned out to be the case. This discrepancy resulted in less fill being available on the job site than had been anticipated in some areas while more fill was required on other places. The contractors asserted that the elevations shown on the contract drawings were warranted by the defendant to be correct and they relied on the warranty in bidding. We held that if the contract supplied the results of tests of soil or other conditions but did not purport to describe actual conditions, or if the contract included disclaimers of responsibility for descriptions, a contractor would not be justified in relying on the results without independent investigation. 173 N.J. Super. at 58. However if the contract contained a positive but erroneous statement of the conditions a contractor relying on it could recover damages for breach of implied warranty. Ibid. We found that the elevations supplied were positive averments purporting actually to describe the land. Thus the defendant was liable for the error. But we denied the claims for the cost of removing unanticipated "wet material" for we indicated that no representations concerning such material had been made and in any event the plaintiffs could not "... overcome the specific disclaimer in the specifications for any information concerning subsurface conditions." 173 N.J. Super. at 59.
Sasso was decided less than two months after Golomore. Sasso involved installation of drains along a highway. The contractor brought suit against the State seeking losses incurred because of alleged inaccuracies in the plans and specifications upon which it relied in preparing its bid. The bids were based on a drawing accompanying plans showing a layer of asphalt two inches deep. In fact the layer was thicker than represented. The State contended it was protected under the *182 terms of the contract, namely articles 1.2.11 and 1.2.12 of the standard specifications, two of the articles involved here.
Article 1.2.11, dealing with "Familiarity with Work," is a general exculpatory clause obligating the contractor to become familiar with the plans and specifications and to investigate the physical characteristics of the site. The clause specifically reads as follows:
Article 1.2.11 Familiarity with Work:
It is the obligation of the Bidder to ascertain for himself all the facts concerning conditions to be found at the location of the Project including all physical characteristics above, on and below the surface of the ground, to fully examine the Plans and read the Specifications, to consider fully these and all other matter which can in any way affect the work under the Contract and to make the necessary investigations relating thereto, and he agrees to this obligation in the signing of the Contract. The State assumes no responsibility whatsoever with respect to ascertaining for the Contractor such facts concerning physical characteristics at the site of the Project....
....
Article 1.2.12 deals with "Subsurface Conditions" and contains an exculpatory clause obligating the contractor to conduct his own investigations of subsurface conditions. Specifically it provides:
Article 1.2.12 Subsurface Conditions:
It is the obligation of the Bidder to make his own investigations of subsurface conditions prior to submitting his Proposal. Borings, test excavations and other subsurface investigations, if any, made by the Engineer prior to the construction of the project, the records of which may be available to bidders, are made for use as a guide for design. Said borings, test excavations and other subsurface investigations are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claims against the State, if in carrying out the Project he finds that the actual conditions encountered do not conform to those indicated by said borings, test excavations and other subsurface investigations.
Any estimate or estimates of quantities shown on the Plans or in the form of proposal, based on said borings, test excavations and other subsurface investigations, are in no way warranted to indicate the true quantities. The Contractor agrees that he will make no claims against the State, if the actual quantity or quantities do not conform to the estimated quantity or quantities, except in acordance [sic] with the provisions of Art. 1.8.4.
In Sasso we held that general exculpatory clauses might not relieve the State from responsibility for its express representations. 173 N.J. Super. at 489. However we found that article *183 1.2.12 was a specific exculpatory clause focusing directly on subsurface conditions and the contract language was "... straightforward, unambiguous and categorical ... in placing responsibility for subsurface investigations on the contractor." Id. at 489. Thus we concluded that under the terms of the contract the State's representations were merely gratuitous and the reliance by the contractor was at his own peril.
Golomore and Sasso stand for the proposition that when the State makes false representations it will be liable for damages resulting from them despite a general disclaimer of liability for inaccurate representations. However, if the disclaimer is sufficiently specific or if the statements only purport to be the results of tests rather than being actual conditions or descriptions of actual conditions, then the contractor cannot recover.
In our view the specifications include certain provisions which are so specific that liability is precluded. These are articles 1.2.5 and 1.8.5. They provide:
Article 1.2.5 Estimate of Quantities:
The estimated quantities of the several scheduled items of work involved in the performance of the Project and stated in the form of proposal are approximate. The actual quantities may be greater or less. Payment will be made only for the actual quantity of authorized work done under each scheduled item.
Article 1.8.5 Payment:
Payment will be made for the actual quantity of authorized work done under each item scheduled in the Proposal at the unit price bid therefor, except as otherwise provided in Art. 1.8.4, and under supplementary agreements, if any, at the price or prices stipulated therein.
....
When the Project is completed and accepted by the Commissioner, a final certificate of cost of the Project will be made by the Engineer, based on the actual As Built quantities of authorized work done under each item scheduled in the Proposal and under supplementary agreements, if any, at the unit price or prices stipulated therein....
....
These articles are straightforward and unambiguous. They limit the State's liability to payment for the actual quantity of work done. Indeed we do not see how they could be more specific. Accordingly we conclude that since the judgment against the State was predicated on a theory that it had to pay for work it did not receive it must be reversed.
*184 We think it appropriate to note that plaintiffs' claim only concerns one item of 82 in the contract so that the case has centered on that item. But the bid form showed that there were numerous items involving approximate quantities stated in terms of weight, gallonage, cubic yards, square yards and linear feet. It is natural that in such a complex situation the contract would provide for payment based on measurements of work actually performed. Indeed if payment was to be based on the approximate quantities set forth in the bid form without regard for performance as measured it is difficult to see why unit prices would be needed. Finally we point out that it is entirely possible that the bidding documents might substantially underestimate the quantity of an item. Surely in that case a contractor would not be limited to the original extended price. Thus we see no reason why the State should be so bound when the quantity is less than that originally anticipated.
Insofar as the judgment of August 12, 1983 imposed liability on the State it is reversed and the action against the State is dismissed. This result renders the balance of the State's appeal moot. Accordingly except for the appeal of the judgment against the State, the balance of the appeal is dismissed.
NOTES
[1] In view of our result we need not and do not pass on any standing issue.