P.T. & L. CONSTRUCTION COMPANY, INC., PLAINTIFF-RESPON-
DENT AND CROSS-APPELLANT, v. STATE OF NEW JERSEY,
DEPARTMENT OF TRANSPORTATION, DEFENDANT-APPEL-
LANT AND CROSS-RESPONDENT.

Argued January 5, 1987—Decided October 19, 1987.

540

*Kevin E. Rittenberry,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Herbert C. Klein* argued the cause for respondent and cross-appellant (*Klein, Chapman, Greenburg, Henkoff & Siegel,* attorneys; *Leonard A. Peduto, Jr.,* on the brief).

*Peter J. Smith* and *Joseph C. Amann* submitted a brief on behalf of *amicus curiae* Construction Industry Advancement Program of New Jersey (*Connell, Foley & Geiser,* attorneys; *Mark L. Fleder,* of counsel).

The opinion of the Court was delivered by

O'HERN, J.

We granted certification, 105 *N.J.* 517 (1986), primarily to consider the respective contentions of the State and a public contractor that the decision below so far departed from settled legal principles as to call for exercise of our appellate supervision. The State contends that the Appellate Division judgment, allowing damages to the contractor for delay attributable to unexpectedly wet site conditions, erred in two respects: (1) it allowed recovery on a theory of "implied warranty" specifically precluded by the New Jersey Contractual Liability Act, *N.J.S. A.* 59:13–1 to –10; and (2) it refused to give effect to the "no damage for delay" provisions of the contract that specifically disclaimed liability for delays caused by differing site conditions, thereby conflicting with three recent reported decisions of the Appellate Division. The contractor contends that the Appellate Division erred in giving force and effect to one aspect of the "no damage for delay" provision when it refused to allow damages for delay occasioned by the work of other contractors that hindered the plaintiff's performance.

We find that there is a sufficient factual basis to sustain the trial court's finding that the State's nondisclosure of material facts constituted a misrepresentation of site conditions for which recovery may be allowed. The general exculpatory clauses of the contract disclaiming responsibility for differing site conditions do not apply in the face of such a finding. We note, however, that had the plaintiff's claim been premised only

on its conclusion that dry working conditions were implicit in the contract specifications, recovery would have been precluded by the specific disclaimers of State responsibility for site conditions. There is a critical distinction between a claim based on the State's implying that conditions would be dry and a claim founded on the State's withholding information that conditions would be wet.

We also find that claims for damages attributed to delays in utility relocation were precluded by the terms of the contract. Hence, we affirm the judgment of the Appellate Division, which disallowed $240,768 in contract extras for the utility delays sought by plaintiff, but did allow recovery of $1,243,861 for the misrepresentation of site conditions.

## I.

We shall state only the facts relevant to the issues that we address. The case involves a substantial contract for a small section of Interstate Route 78 as it passes through the heavily built-up areas of Union County in Springfield, New Jersey. It involves 1.4 miles of construction where the new multi-lane super-highway is cut under two heavily traveled local roads, Vaux Hall Road and Burnett Avenue. The contract has this added feature: it involves a joint venture. Generally, this plaintiff was to do such tasks as cite clearance, underground and roadway work; the other contractor, Ell-Dorer Contracting Co., was to do the bridge construction.

At the work site, the south side of the road is bordered by single-family dwellings, the north side by mixed uses, primarily residential but including a large commercial development with paved parking areas. The reader should try to visualize an east-west cut within this built-up area with an existing downward slope to the west. The plan was to move extra soil from the east end of the project to the west end, to provide drainage both along and across the roadway, to bridge the super-highway for the two local roads, to finish the grade, and to pave the

divided super-highway. Obviously, such a contract is vastly more complex than this description, given here only to provide a background for the dispute.

The contract was awarded on October 31, 1972, for a bid price of $9,337,584.45. Plaintiff and Ell-Dorer commenced work on November 8, 1972. The contract called for completion by November 15, 1974. The contract was not completed until June 11, 1976.

According to plaintiff's witnesses, the job was plagued from the start by poor working conditions. The project foreman said that following the first heavy rain, water collected on the site, sometimes leaving the west end fill site three to four feet under water. This collection of water was attributed to varied site factors to be discussed in detail later. It was this watery condition that made the roadway excavation material too porous to serve adequately as fill material for the bridge embankments and road bed, thereby "creat[ing] a problem as far as making [the] fills." In an attempt to drain the area, plaintiff built a temporary ditch before beginning construction of the box culvert required by the contract plans.[1]

Plaintiff's experts testified that stripping 9.87 acres an average depth of two feet required almost ten times the amount of such stripping called for in the contract, and took 171 days to complete rather than the three days originally allocated to the job. In short, plaintiff contended that the State, through the contract process, had misled it into believing that it would be working under dry or normal working conditions by use of the term "stripping."

---

[1]As to other causes of delay, plaintiff offered testimony that the State's failure to provide, in its plans and specifications, for sheeting to contain the porous fill behind the south wing wall of Vaux Hall bridge delayed completion of the bridge for three and one-half months from the time it took to recognize the problem until the remedy was complete. Change orders were approved by the State on this aspect of the job.

On the utility relocation issue, there was conflicting testimony about the degree to which the poor coordination of the utilities work hindered the completion of the project. Plaintiff contended that the utility delays stalled the project for four months.

Both P.T. & L. and the State claimed compensation for the delays. The State invoked its liquidated damage clause of $300.00 per day.[2] As noted before, P.T. & L. claimed that the delays were caused by the State in that the State misrepresented conditions at the site and caused utility delays. Although in March 1979, P.T. & L. filed a complaint for breach of contract against the State Department of Transportation (because the principles applied are equally applicable to the State and DOT, we use the terms State and DOT interchangeably), it first submitted its claims to the DOT Claims Committee pursuant to the terms of the contract.[3] In July 1979, the parties entered a consent order staying proceedings pending the Committee's decision. The matter was restored to active status when the Committee denied relief in January 1980. This was also apparently one of the first projects constructed under the "Critical Path Method" (CPM) by which computerized work schedules may be adjusted to cope with delays, a factor emphasized in the proofs but not essentially relevant to the legal issues we address. We shall first discuss the opinion and judgments of the courts below and then consider separately the design-deficiency misrepresentation claims and the utility delay claims.

## II.

In an oral opinion, the trial court found the DOT liable for material misrepresentations of conditions at the west end, and

---

[2]The State did not petition to review the judgment below that disallowed liquidated damages in this case.

[3]The issue of waiver of claims limiting P.T. & L.'s demand to a specified sum of $1,750,000 also is not before us.

for utility delays and change orders. Specifically, it held that: the eighteen-inch stripping should have been labeled as wet excavation; the plans should have called for Zone 2 instead of Zone 3 fill material; the DOT's failure to inform plaintiff of the absence of drainage in the area was a material misrepresentation; the plans should have included construction of a cofferdam and a stone base for the culverts; and finally, DOT's withholding of certain information constituted a "misrepresentation if not a fraud." The court found that the material misrepresentations were not covered by the exculpatory or no-damage-for-delay clauses. With respect to the utility delays, the court found that the DOT had a duty to coordinate the activities of the utilities and therefore was liable for its breach in this regard because the exculpatory clauses of the contract covered only delays "within the contemplation of the parties." The trial court awarded plaintiffs $1,484,638 in delay damages.[4]

The Appellate Division affirmed the judgment in all respects except one: it upheld the exculpatory clause as "efficacious in

---

[4]The award was calculated as follows:

| | |
|---|---|
| (1) Cost Overruns | |
| Item 8 — Additional expenses incurred in general roadway excavation due to wet conditions | $661,200 |
| Item 10 — Additional expenses incurred in 18 inch average depth stripping | 32,032 |
| Item 14 — Ditch excavation | 2,551 |
| Wage Escalation and Related Cost | |
| P.T.&L. | 29,750 |
| Triad | 1,800 |
| Lighting Electric | 1,986 |
| (2) Fixed Daily Cost Damages | |
| $1,254 × 465 days of delay | 583,110 |
| (3) Recovery of Liquidated Damages Withheld by DOT | |
| $300 per day × 574 | 172,200 |
| TOTAL | $1,484,629 |

(The trial court rounded off the award at $1,484,638.)

the circumstances of the utility delays." Thus, it disallowed $240,768 of the damage award attributable to those delays.[5]

In this opinion, we shall not address in detail the essentially factual resolution of how the various aspects of DOT's actions affected P.T. & L.'s performance. We shall resolve primarily the underlying legal principles and accept the findings of fact made by the courts below.

## III.

■ The portion of the trial concerning the west end delay issues revolved primarily around four contentions set forth in P.T. & L.'s brief:

(1) the Contract item for 18–inch average depth "stripping" was improperly designated as such in view of the extensive water problem existing in the west end; the work should have been described to bidders as "wet excavation"; [6]

(2) the Contract called for the use of Zone 3 fill material, excavated from the Project site, in the roadway embankments to be constructed in the west end, thereby clearly indicating dry conditions since both the DOT's Standard Specifications and accepted engineering practice require the use of more porous Zone 2 fill material in or under water;

(3) the Contract (P–1, Sheet 18) indicated by way of both a pictorial description (i.e., an arrow) and the use of the word "flow" that a branch or tributary of the East Rahway River which traversed the Project would furnish the drainage facilities required for the west end of the Project, when, in fact, there was no drainage for the area; and

(4) the Contract did not specify either the construction of a cofferdam around the culvert to be built through the west end, or the placement of a stone base underneath the culvert, both of which are ordinarily required when a culvert is to be built under wet conditions.

These contentions illustrate the inevitable polarity of public contracting.

Disputes are inherent in the construction of public works projects. A tension exists between the state and the contractor who agrees to build a project. Each

[5]The Appellate Division calculated the $240,768 figure by reducing the fixed daily cost damages by 192 days of utility delay × $1254 per day.

[6]The contract called for two levels of stripping: six-inch and eighteen-inch. The cost overruns incurred with respect to the former were included in the $661,200; the latter amount was $32,032.

party is oriented to the contract price, which is a fixed amount reached on the basis of competitive sealed bidding. Not only is the contract price fixed, but it is fixed as the lowest amount offered by any responsible contractor who competitively bid for the project.

The rationale used to justify the practice of awarding the contract to the low bidder is that the practice promotes price competition among those seeking public works contracts. Although it may promote competition, the practice of awarding to the low bidder produces an anomalous effect. As a practical matter, awarding the contract to the lowest responsible bidder forces both the contractor and the state to search intensively for means to protect, if not improve, their positions once the contract price is fixed and performance is begun.

The parties' abilities to improve their respective positions largely depend upon the contractual language that allocates cost risks associated with performance. The contractor, who has underbid his competitors to win the contract, wants to minimize his performance costs. Thus, the contractor interprets the contract language in a manner that enables him to render the minimum performance—at the lowest cost—that complies with the terms of the contract. The state, however, like any owner who hires a contractor, is inclined to demand the maximum possible performance.

[Livingston, "Fair Treatment for Contractors Doing Business With the State of Maryland," 15 *Univ.Balt.L.Rev.* 215, 226–27 (1986) (footnotes omitted).]

Government is a major contractor in our society. A formidable body of state and federal law has developed on the subject of differing site conditions as constituting grounds for increased compensation to contractors. In essence, the four contentions of P.T. & L. reduce to the one argument that it encountered unexpectedly wet conditions at the site that delayed its work progress. To summarize the four contentions: (1) the "18 inches average stripping" item should have been described as "wet excavation"; (2) the fill material specified was suitable only for "dry conditions"; (3) the drainage arrow on the drawings connoted "dry conditions" of work; and (4) the box culvert drawings did not specify either a cofferdam or stone base, thus signifying no "wet conditions."

First, we must note that the standard State contract does not contain a "differing conditions" clause. The federal practice, however, is often to include a "differing conditions" clause in the contract documents. Notwithstanding, the general principles of law applicable to "differing conditions" clauses must be

referred to, for they are instructive on the policy underlying the law. This policy is well set forth by the following:

> The starting point of the policy expressed in the changed conditions clause is the great risk, for bidders on construction projects, of adverse subsurface conditions: "no one can ever know with certainty what will be found during subsurface operations." *Kaiser Industries Corp. v. United States*, * * * 340 F.2d 322, 329 [169 *Ct.Cl.* 310] (Ct.Cl.1965). Whenever dependable information on the subsurface is unavailable, bidders will make their own borings or, more likely, include in their bids a contingency element to cover the risk. Either alternative inflates the costs to the Government. The Government therefore often makes such borings and provides them for the use of the bidders, as part of a contract containing the standard changed conditions clause.

> Bidders are thereby given information on which they may rely in making their bids, and are at the same time promised an equitable adjustment under the changed conditions clause, if subsurface conditions turn out to be materially different than those indicated in the logs. The two elements work together; the presence of the changed conditions clause works to reassure bidder that they may confidently rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.

> The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

> *All this is long-standing, deliberately adopted procurement policy,* expressed in the standard mandatory changed conditions clause and enforced by the courts and the administrative authorities on many occasions.

> [*Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 *F.*2d 873, 887, 193 *Ct.Cl.* 587 (1970) (emphasis added).]

That court's view of the policy is that courts should not frustrate it by a too-expansive concept of the bidder's duty to investigate.

The difficulty lies in applying these broad policy principles to particular cases. The seminal case setting forth the policy is *United States v. Spearin*, 248 *U.S.* 132, 39 *S.Ct.* 59, 63 *L.Ed.* 166 (1918). When the government makes a positive statement of fact about the character of work to be performed, upon which the contractor may reasonably rely, it is binding on the

government notwithstanding the inclusion of exculpatory clauses in the contract. *Id.* at 136–37, 39 *S.Ct.* at 61, 63 *L.Ed.* at 169–70. The reason: "if the contractor is bound to build according to the plans and specifications * * *, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 *S.Ct.* at 61, 63 *L.Ed.* at 169. More to the point is *Hollerbach v. United States*, 233 *U.S.* 165, 34 *S.Ct.* 553, 58 *L.Ed.* 898 (1914). There, the Court held inapplicable a disclaimer as to site conditions where the specifications were clear, but false. The government had stated that the dam to be repaired was backed by a stone compound, not the crib work found by the contractor. The court stated that "it would be going quite too far to interpret the general language of other paragraphs as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt." *Id.* at 172, 34 *S.Ct.* at 556, 58 *L.Ed.* at 901.

Contractual provisions shifting liability to the contractor to investigate site conditions have been limited, *Umpqua River Navigation Co. v. Crescent City Harbor*, 618 *F.*2d 588, 594 (9th Cir.1980), because the "government cannot make a contractor the insurer of all government mistakes." *Michigan Wisconsin Pipeline Co. v. Williams-McWilliams Co.*, 551 *F.*2d 945, 953 (5th Cir.1977) (citations omitted). Such courts have held that equity bars the public entity from gaining a windfall where the contractor reasonably relied on the specifications and the error in representation was material. *D. Federico Co., Inc. v. New Bedford Redevelopment Auth.*, 723 *F.*2d 122, 125 (1st Cir. 1983); *Umpqua River Navigation Co., supra*, 618 *F.*2d at 594. Nevertheless, the contractor must absorb expenses that would have been avoided if the contractor had been conscientious in its investigation. *D. Federico Co., Inc. v. New Bedford Redevelopment Auth., supra*, 723 *F.*2d at 125.

Similar themes have developed in state law. California was among the first to imply a warranty of correctness in contract plans and specifications furnished by public bodies. *See Souza*

& McCue Constr. Co. v. Superior Court of San Benito Cty.,
57 Cal.2d 508, 370 P.2d 338, 20 Cal.Rptr. 634 (1962) (citing
Gogo v. Los Angeles County Flood Control Dist., 45 Cal.App.
2d 334, 114 P.2d 65 (1941)). However, subsequently in E.H.
Morrill Co. v. State, 65 Cal.2d 787, 423 P.2d 551, 56 Cal.Rptr.
479 (1967), it limited the implied warranty to situations in which
the state makes positive and material representations as to
conditions within the knowledge of the public body, the facts
about which the bidder is not reasonably able to discover for
itself. Where statements honestly made are neither positive
nor specific, but are suggestive only, and where the parties are
in an equal position as to knowledge and information surround-
ing the contract, California has held that a purported warranty
may be disclaimed. Wunderlich v. State ex rel. Dep't of
Public Works, 65 Cal.2d 777, 423 P.2d 545, 56 Cal.Rptr. 473
(1967). Other states have followed this rule, focusing on the
specificity of the disclaimer, see, e.g., Nelson Constr. Co. v.
Port of Bremerton, 20 Wash.App. 321, 582 P.2d 511 (Ct.App.
1978) (no recovery where explicit disclaimer included warning
that conditions encountered might not be amenable to normal
procedures and provided special means of compensation for this
contingency), the materiality of the alleged misrepresentation,
see, e.g., Metro Sewerage Comm'n v. R.W. Constr., Inc., 72
Wis.2d 365, 241 N.W.2d 371 (1976) (material misrepresentation
found where test logs indicate presence of pressurized artesian
water, which is very difficult to remove, and contract drawings
indicate presence of water, but omit mention of type of water
condition), and the reasonableness of the bidder's reliance, see,
e.g., Ray D. Lowder, Inc. v. North Carolina State Highway
Comm'n, 26 N.C.App. 622, 217 S.E.2d 682 (Ct.App.) (plaintiff
reasonably relied on contract estimates based on outmoded
report made by department not involved in bidding, which
report was not made available to bidders), cert. denied, 288
N.C. 393, 218 S.E.2d 467 (1975).

New Jersey State public contract law has evolved on parallel lines but without a "differing conditions" clause.[7] Yet, our courts appear to have made the same policy judgment as other jurisdictions. The three cases referred to by the State in its petition for certification were *Sasso Contracting Co. v. State*, 173 *N.J.Super.* 486 (App.Div.), *certif. den.*, 85 *N.J.* 101 (1980); *Golomore Associates v. New Jersey State Highway Auth.*, 173 *N.J.Super.* 55 (App.Div.1980); and *Ell-Dorer Contracting Co. v. State*, 197 *N.J.Super.* 175 (App.Div.1984). Each case dealt, at least in part, with two specific clauses in standard state contracts disclaiming liability for site conditions.[8] The two

[7]P.T. & L. was, apparently, the party-plaintiff in the seminal decision of *P.T. & L. Construction Co. v. Commissioner, Dept. of Transportation*, 55 *N.J.* 341, 346 (1970), which imposed contractual liability on the State "even though satisfaction of a favorable judgment would depend wholly on the willingness of the Legislature to honor the judgment and provide for payment." Subsequently, the Legislature enacted the New Jersey Contractual Liability Act, *N.J.S.A.* 59:13–1 to –10, *L.*1972, *c.* 45. Even though the purpose of the legislation was "primarily * * * to treat the State similarly to private individuals and corporations * * *, it nonetheless provided that the State should not be subjected to liability on the basis of a contract implied at law, [or] for breach of warranty * * * since the nature and extent of such liability and damages could expose the State to unforeseen risks." Legislative Statement to Contractual Liability Act, *L.* 1972, *c.* 45.

[8]The two clauses were described in *Ell-Dorer Contracting Co. v. State*, 197 *N.J.Super.* 175 (App.Div.1984), thus:

Article 1.2.11, dealing with "Familiarity with Work," is a general exculpatory clause obligating the contractor to become familiar with the plans and specifications and to investigate the physical characteristics of the site. The clause specifically reads as follows:

*Article 1.2.11 Familiarity with Work:*

It is the obligation of the Bidder to ascertain for himself all the facts concerning conditions to be found at the location of the Project including all physical characteristics above, on and below the surface of the ground, to fully examine the Plans and read the Specifications, to consider fully these and all other matter [sic] which can in any way affect the work under the Contract and to make the necessary investigations relating thereto, and he agrees to this obligation in the signing of the Contract. The State assumes no responsibility whatsoever with respect to ascertaining for the Contractor such facts concerning physical characteristics at the site of the Project.

earlier cases have been viewed as presenting "arguably different views on determining the impact of [such] disclaimers." T. Geiser & B. Donohue, *New Jersey Construction Law* 14 (1986). In *Golomore, supra,* despite the existence of a general disclaimer, the Appellate Division found a positive representation in government contract drawings that incorrectly depicted the elevations on the job site. The misrepresentations led contractors to anticipate more fill material than was actually available and the court held that the contractor could pursue damage claims for the additional costs that resulted. 173 *N.J.Super.* at 58–59. But the court barred recovery for additional costs incurred in removing unanticipated wet material since the specifications were silent on this issue. *Id.* at 59. In *Sasso, supra,* 173 *N.J.Super.* at 486, the contract drawings represented the existing layer of asphalt as two inches deep when, in fact, it was an average of three and one-half inches deep. The court, however, called the State's representations of the job site

---

Article 1.2.12 deals with "Subsurface Conditions" and contains an exculpatory clause obligating the contractor to conduct his own investigations of subsurface conditions. Specifically it provides:

*Article 1.2.12 Subsurface Conditions:*

It is the obligation of the Bidder to make his own investigations of subsurface conditions prior to submitting his Proposal. Borings, test excavations and other subsurface investigations, if any, made by the Engineer prior to the construction of the project, the records of which may be available to bidders, are made for use as a guide for design. Said borings, test excavations and other subsurface investigations are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claims against the State, if in carrying out the Project he finds that the actual conditions encountered do not conform to those indicated by said borings, test excavations and other subsurface investigations.

Any estimate or estimates of quantities shown on the Plans or in the form of proposal, based on said borings, test excavations and other subsurface investigations, are in no way warranted to indicate the true quantities. The Contractor agrees that he will make no claims against the State, if the actual quantity or quantities do not conform to the estimated quantity or quantities, except in acordance [*sic*] with the provisions of Art. 1.8.4. [197 *N.J.Super.* at 182.]

conditions "merely gratuitous" and held that the contractor, who was obliged to remove the excess material, relied on the information at its own peril. *Id.* at 490.

The two cases were reconciled in *Ell-Dorer* by Judge Greenberg, who stated:

> *Golomore* and *Sasso* stand for the proposition that when the State makes false representations it will be liable for damages resulting from them despite a general disclaimer of liability for inaccurate representations. However, if the disclaimer is sufficiently specific or if the statements only purport to be the results of tests rather than being actual conditions or descriptions of actual conditions, then the contractor cannot recover.[9] [197 *N.J.Super.* at 183.]

We see no difference in applying the principles applicable to the "subsurface" site conditions or the disclaimers in the context of this case. If anything, the contractor's burden to investigate is easier to meet with regard to surface conditions.

Applying these principles to this case, we ask: (1) Is the disclaimer sufficiently specific, i.e., is it straightforward and unambiguous as applied to the contract interpretations at issue, *see, Buckley & Co., Inc. v. State,* 140 *N.J.Super.* 289 (Law Div.1975); [10] or conversely, (2) Are the statements in the contract themselves ambiguous and not descriptive of actual working conditions, i.e., are they not positive averments purporting actually to describe the land?

---

[9]In *Ell-Dorer,* the court found that the contract specifications included additional provisions so specific that liability was precluded. The contractor claimed that the State had misrepresented the quantity of fill on the site. But the contract specifications stated that "the estimated quantities of the several scheduled items of work involved in the performance of the Project and stated in the form of proposal are approximate. The actual quantities may be greater or less." The court found that payment would be authorized only for the "actual quantity of authorized work done under each item scheduled in the Proposal at the unit price bid therefor * * *." The court concluded that "these articles are straightforward and unambiguous. They limit the State's liability to payment for the actual quantity of work done." 197 *N.J.Super.* at 183.

[10]*Buckley* illustrates judicial analysis of disclaimers in public contract context.

As far as the plaintiff's contention that the contract specification of eighteen-inch average depth stripping constitutes a representation as to subsurface or surface conditions, the item in fact simply appears to represent a description of the work that had to be done on the west end of the site before the fill could be moved from the east end and placed at the west end. The specification tells what had to be done, not how it was to be done. *S & M Constructors, Inc. v. City of Columbus*, 70 *Ohio St.*2d 69, 71–5, 434 *N.E.*2d 1349, 1352–53 (1982); *see Wunderlich, supra*, 65 *Cal.*2d at 782, 423 *P.*2d at 548, 56 *Cal.Rptr.* at 476. Nevertheless, the critical question is whether the contract specifications were "positive averments which purported to actually describe the land," *Golomore, supra*, 173 *N.J.Super.* at 58, or ones "which made no mention of whether such conditions would be encountered." *Id.* at 59. If the latter applies, the plaintiff will have "failed to state a claim with respect to the additional costs of removing unanticipated wet material." *Ibid.* In *Golomore*, recovery was allowed only for damages caused by the actual misrepresentation of elevations on the job site that resulted in less fill being available.

In this case, the specifications appear ambiguous. The contract specifications themselves simply refer to the stripping item as the removal of vegetation. They state, "[b]efore grading work is commenced, the vegetation and underlying topsoil within excavation and embankment areas shall be stripped off to a depth * * *." Standard Specifications, Article 2.2.3. Plaintiff emphasizes that use of the term "stripping," which is not defined in the specifications, indicates that the project would "be a dry operation that can be performed with bulldozers or scrapers rather than wet excavation with a drag line." But this type of contention appears to have been rejected by the court in *Golomore, supra*, 173 *N.J.Super.* at 59, when it stated:

We conclude, however, that plaintiffs have failed to state a claim with respect to the additional costs of removing unanticipated wet material. The specifications at issue made no mention of whether such conditions would be encountered. Even if the absence of such statements might have been significant because it is customary in the industry to note such factors, plaintiffs cannot

overcome the specific disclaimer in the specifications for any information concerning subsurface conditions. That defendants might have provided for separate and increased payments for such work if they had anticipated the condition is of no moment where there has been a specific disclaimer, and no information to the contrary has been withheld.

Plaintiff also emphasizes the apparently erroneous description of the quantity of eighteen-inch stripping set forth in the contract.[11] But it is difficult to understand why even the casual visual observation of the site made by P.T. & L. would not have disclosed the scope and quantity of work involved in removing the vegetation. Plaintiff's principal officer described his visit to the premises before the submission of P.T. & L.'s bid as disclosing that dry grass and vegetation covered the entire site. He testified: "I saw low area, dry as a bone. * * * Absolutely dry as a bone. Dusty. * * * [The ditches were] [a]ll dried out."

The argument with respect to the Zone 3 material presents the same basic issue. The contract provided that the material from the east end of the site was to be used as fill for the west end. P.T. & L.'s best case scenario was that it would be trucking the material from east to west "at 35 mph." P.T. & L. argues that it interpreted the contract documents as warranting dry working conditions because of the specified use of Zone 3 material, which is upland fill. Zone 3 material is silty and has the characteristic of plasticity in that it gets mushy when wet. In contrast, Zone 2 material, because it is more porous, gravelly, and free draining, is a material suitable for filling in wet locations. No one disputed that the test borings for the project showed that the site material would become silty when mixed with water.

As it turns out, the contract was in fact performed with the use of the Zone 3 material. Concededly the job was enormously more difficult than expected because of the adverse working

---

[11]The trial court's opinion resolved the effect upon the contract delay claims of the change order which increased the contract item for stripping from one acre to ten acres.

conditions encountered.  But again, the question is whether the specification amounts to a positive averment describing the actual condition of the land as exemplified by the unambiguous but incorrect statement of the road elevation in *Golomore,* or a more general description of site conditions, qualified by a disclaimer, as in *Sasso.*

The contractor's argument premised on the arrow depicting water drainage on the drawings is similar.  Is it more than informational?  The particular work site served as a local drainage area eventually flowing to a branch of the East Rahway River.  There were numerous problems at the site.  The foremost problem was that downstream from the site an obstruction at the point where the stream crossed Morris Avenue caused a general water backup into this area.  This backup was to have been alleviated by a United States Army Corps of Engineers project involving a change in the stream bed of the East Rahway River and a partial removal of the Morris Avenue obstruction.  The Army Corps project, however, was never undertaken.  The State argues that there was drainage for the area; the fact is that the drainage was inadequate.  Nevertheless, it hardly seems likely that the use of an arrow and the word "flow" would constitute a representation that the conditions observed would remain stable.  When the plaintiff viewed the site, it was at the end of an extraordinarily dry summer, and this tributary to the East Rahway River was nothing more than a dry river bed.

The final point concerns the construction of a temporary cofferdam around the box culvert to be built through the west end and underlaid by a stone base.  Plaintiff argues that the failure to provide for these two wet condition design features in the specifications constitutes a positive averment that site conditions would be dry.  The contractor may have interpreted the documents in this manner, but the absence of these design features does not constitute a positive averment.  Even plaintiff's interpretation is difficult to sustain in view of the fact that the lower elevation of the proposed box culvert was at a

seventy-six foot elevation and that the test borings of the State revealed, on several occasions, that the water level was above an eighty foot elevation.

What we must balance, then, is the presence or absence of a clear and unambiguous description of ground conditions in any of the four particulars above, against the unambiguous obligation of the bidder to "make his own investigations of subsurface conditions prior to submitting his Proposal." Standard Specifications, Article 1.2.12. As to the description of ground conditions, the contractor agreed that it would "make no claim for additional payment or extension of time for completion of the work * * * because of any *misinterpretation* or *misunderstanding* of the Contract, on his part, or of any failure to fully acquaint himself with all conditions relating to the work." Standard Specifications, Article 1.2.11 (emphasis added). If the sole issue in this case was one of misrepresentation or misinterpretation, we would find the contentions to be much closer to those in *Ell-Dorer* and *Sasso*.

But the trial court also premised its judgment on other findings. The law generally provides that under certain circumstances a governmental agency may be liable for failing to impart its knowledge of the difficulties to be encountered in a construction project. The California Supreme Court in *Warner Construction Corp. v. City of Los Angeles*, 2 *Cal.*3d 285, 294, 466 *P.*2d 996, 1001, 85 *Cal.Rptr.* 444, 449 (1970), held that

a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows that they are not known to or reasonably discoverable by the plaintiff; and (3) the defendant actively conceals discovery from the plaintiff. [footnotes omitted.]

*See generally*, Annotation, "Public Contracts: Duty of Public Authority to Disclose to Contractor Information, Allegedly in its Possession, Affecting Cost or Feasibility of Project," 86 *A.L.R.*3d 182 (1978) (where not prohibited by a sovereign immunity or limited by statute, public contractor may sue govern-

ment for its concealment or nondisclosure of material information if affirmative misrepresentations made to contrary). Of course, when the contrary policy choice has been made to insert a differing conditions clause in the contract, it is not necessary to find that the bidder was "misled" or that the government "concealed" information. *United Contractors v. United States,* 368 *F.*2d 585, 597 n. 6, 177 *Ct.Cl.* 151 (Ct.Cl.1966). This is because

> the very purpose of * * * [the differing conditions clause] is to prevent bidders from adding high contingency factors to protect themselves against unusual conditions discovered while excavating * * *. [*Id.* 368 *F.*2d at 599.]

It will suffice under that form of contract that the bidder did not expect or have reasonable cause to anticipate the underground conditions encountered.

Since the standard State contract shifts to the bidder the burden of evaluating subsurface conditions, the higher standard should be met. *See also Maurice Mandel, Inc. v. United States,* 424 *F.*2d 1252, 1256 (8th Cir.1970) (absent express representation or warranty, bidder is responsible to determine soil conditions). This was the point emphasized in *Golomore, supra,* 173 *N.J.Super.* at 58, which barred recovery for unexpected wet conditions "if no information to the contrary has been withheld." Federal public contracting law emphasizes the point, however, in analyzing whether a bidder has adequately investigated the site. *See D. Federico Co., Inc. v. New Bedford Redevelopment Auth., supra,* 723 *F.*2d 122, 125–26; *Flippin Materials Co. v. United States,* 312 *F.*2d 408, 413 & n. 8, 160 *Ct.Cl.* 357 (Ct.Cl.1963); *Robert E. McKee, Inc. v. City of Atlanta,* 414 *F.Supp.* 957, 959–60 (N.D.Ga.1976).

Here there were two aspects of the case in which the trial court found that facts were known or reasonably accessible only to defendant and were not known to or reasonably discoverable by the plaintiff. First, there was the so-called "Madigan-Hyland letter," dated December 30, 1964.[12] This letter

---

12There is no claim that the State knowingly withheld this letter. In fact, the letter was found only in the files of Madigan-Hyland during discovery. The

clearly disclosed to the State that working conditions at the site would impose unusual difficulties for a construction contractor. In the fill area between the proposed Springfield Avenue bridge and the cut and fill line, i.e., the area that is the focus of this litigation, Madigan-Hyland stated that the "extent of the removal of the wet excavation * * * will depend on the climatic conditions and the time of the year in which the construction will be accomplished." The trial court was most aggrieved by this feature of the case, saying that "[t]he withholding of the Madigan-Hyland information *represented a misrepresentation, if not a fraud,* for the withholding of material information." (emphasis added). Second, the design of the project itself was predicated on the completion of a project to drop a branch of the East Rahway River in accordance with the plan of the Army Corps of Engineers, a factor relevant to the court's conclusion concerning the culvert construction.[13] These factual omissions and assumptions were held by the trial court to constitute, along with other design features, "design defects, and those design defects [did] constitute misrepresentations to this contractor at the time [it] bid."

It is the unrevealed information that takes this case out of the defense theory asserted by DOT that a "contract implied in the law" is barred pursuant to the prohibition of *N.J.S.A.* 59:13-3 that "there shall be no recovery against the State * * * for claims based upon implied warranties or upon contracts implied in law." In short, it is not an implied representation but a series of misrepresentations upon which the trial court premised its award to plaintiff.

---

*1964 date indicates that the letter was written when initial work for the project was first undertaken.*

13Although not mentioned in the trial court's findings, the evidence indicated that there there was a pipe or pipes that crossed the site at the west end at an elevation of 80 feet. These pipes made it practically impossible for the water level to subside below the 80 foot level for any extended period of time.

Although the findings of the trial court may be regarded as mixed resolutions of law and fact, "we are conscious of the usual reluctance of an appellate tribunal to interfere with such a finding." *In re Dodge*, 50 *N.J.* 192, 241 (1967). "Unless we have a definite conviction that the judge went so wide of the mark, a mistake must have been made, we are duty-bound to accept his factual findings." *Tantum v. Binz*, 186 *N.J.Super.* 296, 298 (App.Div.1981) (citations omitted), *rev'd o.g.*, 91 *N.J.* 426 (1982). Our review is thus limited to determining whether there is sufficient credible evidence in the record to support these findings, *Close v. Kordulak Bros.*, 44 *N.J.* 589, 598–99 (1965), not whether we might have made them ourselves.

As we know, in the long run, it is the public that pays for these cost over-runs. Courts must weigh the unknown economic consequences of reinterpretation of contract documents. In this case it does not appear to have been much of a secret that this site frequently flooded. The problem of the backup at the Morris Avenue bridge site was well known in the area. It had been the subject of frequent public meetings. Accordingly, a bidder who had familiarized itself with these site conditions might have submitted a bid based on wet excavation techniques that was higher than P.T. & L.'s bid but lower than the ultimate cost to the State as a result of our judicial determination. Hence, a natural uncertainty exists about permitting recovery in this case.

But the trial court had much the better opportunity to evaluate all of the testimony and the exhibits, and to weigh all the relevant factors, especially what it regarded as withheld information, to determine whether a misrepresentation of site conditions caused the delay. It devoted thirty-eight days to the trial of the liability issues and six days to the trial of the damage issues. The trial took place in 1982 before the 1984 decision in *Ell-Dorer*. We are convinced that the trial court, even had it viewed the four factors emphasized by plaintiff in a manner similar to ours, would have taken these factors into account as cumulative of its conclusion that the site conditions were mis-

represented. We find then in this record and the trial court's opinion a sufficient factual predicate, within the principles stated, to sustain the judgment of the trial court and Appellate Division on this aspect of the case. In the future we shall expect that judicial factfinders will hew more closely to the contours of public contract law as outlined in *Ell-Dorer* and re-emphasized here.

Should we err by giving too much force to the contract documents that would limit recoveries such as those awarded here, bid prices will have to be inflated to cover the risk. The State will have to adjust its policy in response to those market factors, not to the vagaries of litigation. That policy choice was emphasized during oral argument when the State argued that it "would rather pay up front than through litigation" in order to ensure better budget predictions and public confidence in government spending. But once a policy choice in bidding is made, it should be respected. Contractual provisions plainly providing for allocation of the risk to the contractor should mean just that. There may be situations in which the public agency simply does not know of the subsurface conditions and the contractor must bid in accordance with the risks. *But see D. Federico v. New Bedford Redevelopment Auth., supra,* 723 *F.*2d 122 (Authority's failure to disclose information pertinent to project and not readily available to contractor permits recovery for extra costs incurred by contractor).

Moreover, there are other solutions to public contracting disputes. Binding arbitration is one. (*See* Livingston, *supra,* 15 *U.Balt.L.Rev.* 215, for other suggestions). But it is not for us to tell the State how to conduct its public bidding. *Cf. Keyes Martin & Co. v. Director, Div. of Purchase & Property,* 99 *N.J.* 244 (1985) (statutory scheme limits judicial review of public bidding decisions).

For now, we believe the best course should be to allow the parties to adjust their bids to market choices reflected by the specifications. "The contractor that chooses to accept these

risks [should] reflect the accompanying responsibility in [its] price." *Broadway Maintenance Corp. v. Rutgers,* 90 *N.J.* 253, 270 (1982).

■ To sum up, when the State actually makes false representations in its contract documents that are more than gratuitous and amount to positive averments of site conditions, it will remain liable to the public contractor despite a general exculpatory clause in the contract. In some cases, actual concealment of information may be considered a false factual representation. Inferential conclusions from contract documents, however, shall not be considered a false factual representation in the face of sufficiently clear and unambiguous disclaimers of liability by the State.

## IV.

■ The remaining major issue in the case is P.T. & L.'s contention that the Appellate Division erred by giving effect to a disclaimer of damages for delay provision where the delay was attributable to failures of performance by other contractors. Once again, we must address the question of policy: How should the parties resolve the economic risk? Obviously, nearly every public contract involves difficult balancing and scheduling procedures.

In this case, the scheduling was made even more complex by the various stages of utility relocation work. Temporary detour roads had to be built and utilities installed. When the new bridges were in place, utilities had to be run through the conduits; then the temporary service had to be removed. Plaintiff contended that its work was delayed in several particulars. At the Vaux Hall Road bridge, the gas company was two weeks late in arriving to start work; the water company was two weeks late in arriving at work and was late in finishing its work. Later in 1974, the electric utility was six weeks late starting work, had to suspend work due to a shortage of underground cable, and failed to take down deactivated lines on

the detour road and on an existing road that was to be removed as part of the project. The situation at the Burnett Avenue bridge was similar. In the fall of 1974, workers for the gas utility allegedly walked off the job because of a dispute with the State, thereby preventing the contractor from completing bridge approaches and main line construction. In both cases, excavation had to be done around the utility poles that were left in place on mounds in the main line of the highway project. As a result of these various utility delays, plaintiff claimed four months damages.

The issue here concerns Article 1.4.2 of the Standard Specifications that provided:

> The right is reserved by the State to do work with its own employees or by other contractors and to permit public utility companies and others to do work during the progress and within the limits of, or adjacent to, the Project, and the Contractor shall conduct his work and cooperate with such utility companies and others so as to cause as little interference as possible with their work, as the Engineer may approve. The Contractor shall allow other Contractors and utility companies and their agents access to their work within the site of the Project. The Contractor shall and hereby does agree to make no claims against the State for additional payment due to delays or other conditions created by the operations of such other parties * * *.

In *Broadway Maintenance Corp., supra,* 90 *N.J.* 253, we had occasion to review the application of such a clause in connection with the alleged liability of Rutgers University for failure to supervise the work of subcontractors. This Court held that Rutgers University could not be held liable for the delays occasioned by the work of other contractors in the face of a similar "no-damage for delay" clause. *Id.* at 268. The Appellate Division here read this article in conjunction with Article 1.6.11 of the Supplementary Specifications, which required the contractor to provide the other contractors with access to the project site and further required cooperation with regard to the extensive relocation of utilities. This article also specifically listed each of the utilities involved in the extensive relocation work.

Plaintiff points to the fact that the *Broadway Maintenance Corp.* clause specifically referred to any act or neglect of the

*owner,* whereas the contract in this case only refers to the acts of other contractors. We agree, however, with the Appellate Division that in this case the plain language of the disclaimer clause appears to cover the damages sought by plaintiff. As the Court noted in *Broadway Maintenance Corp., supra,* such provisions are "part of the economic package upon which the parties agree." 90 *N.J.* at 270. *Broadway Maintenance* dealt with multiple prime contracts for the general construction of a medical school as well as for the electrical and plumbing work. Coordination of each prime's work was critical. Coordination here, however, was of the utilities' work, not of other primes. The State in *Broadway Maintenance* denied it had any duty to coordinate under the circumstances. But even were such a duty found in the present case, we reaffirm the rule stated in *Broadway Maintenance* that when there is a disclaimer of liability, in the absence of a specific finding of bad faith, the State will not be liable for delays in carrying out its duty to coordinate, even if the delay is unreasonable. As the Appellate Division noted in *Dobson v. State,* 218 *N.J.Super.* 123, 128–29 (App.Div.), *certif. den.,* 108 *N.J.* 666 (1987),

"[a]ctive interference" connotes more than negligence. While the term is not capable of precise definition, it contemplates reprehensible behavior beyond "a simple mistake, error in judgment, lack of total effort, or lack of complete diligence...." *Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.,* 355 *F.Supp.* 376, 399 (S.D.Iowa 1973). The public agency must commit some affirmative, willful act, in bad faith which unreasonably interferes with the contractor's compliance with the contract terms before it can be said that there has been active interference which subjects the public agency to delay damages notwithstanding the no damage for delay clause in the contract. *Ibid.* The ultimate determination must be based on the intention of the parties, *Buckley & Co., Inc. v. State,* 140 *N.J.Super.* 289, 299 (Law Div.1975), as can be discerned from the contractual language in light of the circumstances. *Broadway Maintenance Corp., supra,* 90 *N.J.* at 270.

This is precisely the latitude that the State bargains for in its multiple contracts, namely, that it shall not be liable for the cross-delays occasioned by the various contracting efforts. Nor shall it expose itself to inquiries into the reasonableness of every delay.

In this case, the trial court did not make a specific factual finding that the State had interfered with plaintiff's performance or wrongfully interfered with other subcontractors' work. The trial court tended to equate the amount of delay with the owner's breach of duty to coordinate. It concluded that the disclaimer could not be given force and effect because the delay was unreasonable and not within the contemplation of the parties. But in *Broadway Maintenance* we held:

Such a construction would subject [the public entity] in almost every case to the question of whether the delay was reasonable, thereby rendering the provision meaningless. *See Psaty & Fuhrman, Inc. v. Housing Authority*, 76 *R.I.* 87, 68 *A.2d* 32 (1949). The very purpose of the clause was to avoid that type of exposure and, though a contractual provision should generally be construed narrowly against the drafter, *Ace Stone, Inc. v. Wayne Township*, 47 *N.J.* [431,] 434 [ (1966) ], the construction should be sensible and in conformity with the expressed intent of the parties. [*Broadway Maintenance, supra*, 90 *N.J.* at 270–71.]

P.T. & L.'s view of the obligation of the State as expressed in its brief was that the State would have to ascertain, before the start of the work, that the utilities had all the parts, materials, and supplies necessary to do the job, as well as sufficient crews available to perform the work tasks, that it must ensure that the utilities perform on the dates scheduled, insuring the utilities adhere to and comply with the agreed time table for their work. We reject such a view. Obviously, those third parties may remain liable to other contractors, in the absence of specific language in the documents, for the breach of their contractual duties. *Broadway Maintenance, supra*, 90 *N.J.* at 268. But we suspect that a significant portion of public contracting throughout the State is accomplished with good cooperation from the utilities whose mutual interests are involved.

The final issue raised by the defendant was that the prohibition against prejudgment interest on damages awarded for the State's breach of an express contract is unconstitutional. We agree with the Appellate Division's disposition of that issue. The awarding of prejudgment interest is generally a matter of judicial discretion governed by equitable principles.

*Bak-A-Lum Corp. v. Alcoa Building Products,* 69 *N.J.* 123, 131 (1976). See *Rule* 4:42–11(b) (allowing prejudgment interest in tort actions). The New Jersey Contractual Liability Act, *N.J.S.A.* 59:13–8, precludes the award of prejudgment interest for claims against public entities. Thus, the Appellate Division held that plaintiff did not have a vested right to prejudgment interest. It therefore reasoned by analogy to its holding in *Dorn v. Transport of New Jersey,* 200 *N.J.Super.* 159 (App. Div.1984) (exempting New Jersey Transit Corporation from prejudgment interest under the New Jersey Tort Claims Act), that the preclusion of prejudgment interest in this case was constitutional. *Cf. West Virginia v. United States,* 479 *U.S.* ——, ——, 107 *S.Ct.* 702, 707, 93 *L.Ed.*2d 639, 647 (1987) (a state may refuse to be liable for prejudgment interest in suits brought by private party).

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justice CLIFFORD, HANDLER, POLLOCK and O'HERN—5.

*Opposed*—None.