**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1726-19

SCAFAR CONTRACTING, INC.,

    Plaintiff-Appellant,

v.

CITY OF NEWARK,

    Defendant/Third-Party
    Plaintiff-Respondent,

v.

MALCOM PIRNIE, INC.,
a/k/a ARCADIS U.S., INC.,

    Third-Party Defendant.

_____

Argued October 4, 2021 – Decided March 29, 2022

Before Judges Messano, Rose, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6951-14.

Shawn R. Farrell argued the cause for appellant (Cohen Seglias Pallas Greenhall & Furman, PC, attorneys;

Shawn R. Farrell, Jennifer R. Budd, and Gary J. Repke, Jr., on the briefs).

Morrison Kent Fairbairn argued the cause for respondent (Michael A. Armstrong & Associates, LLC, attorneys; Michael A. Armstrong and Morrison Kent Fairbairn, on the brief).

PER CURIAM

Plaintiff Scafar Contracting, Inc., submitted the lowest bid in response to the City of Newark's request for bids (RFB) to construct a "Combined Sewer Overflow" facility on .46 acres of open space at Clay Street, adjacent to the Passaic River. The RFB's scope of work included the removal of an estimated 7,000 tons of non-hazardous soil and 10,000 tons of hazardous soil, and bidders were required to submit per unit prices for each category of soil to be removed. Plaintiff's bid was $9,987,834, based on quoted prices of $22/ton of non-hazardous soil, and $123/ton for hazardous soil. The City accepted the bid, and the parties executed a contract for that amount, which incorporated, with exceptions we note below, the terms, conditions, specifications and other information provided in the RFB.

Plaintiff completed the work, but disputes arose during its performance of the contract, with plaintiff claiming that the City had superior knowledge of the actual conditions of the soils which plaintiff was required to excavate and

dispose of and failed to disclose these conditions. Plaintiff asserted the technical reports made available at the time of the bid failed to disclose the actual conditions at the site. As a result, plaintiff claimed its costs for installing a cofferdam at the site and testing and disposing of the excavated material greatly increased and generated delays that increased plaintiff's expenses in performing the contract. Plaintiff filed a complaint against the City alleging breach of contract, unjust enrichment, or alternatively, quantum meruit, and violation of the Prompt Payment Act (PPA), N.J.S.A. 2A:30A-1 to -2. The City filed its answer.[1]

Discovery ensued, and the City subsequently moved for summary judgment. It contended under the terms of the incorporated RFB documents plaintiff was not entitled to additional payments, and, furthermore, plaintiff's failure to comply with the claim-notice provisions of the contract barred its request for additional payment. Plaintiff cross-moved for partial summary judgment, arguing the contract documents included a "Differing Subsurface or

---

[1] The City later impleaded third-party defendants Malcom Pirnie, Inc., and Arcadis U.S., Inc., which later consolidated into a single company, Arcadis, served as the City's engineering consultant for the project. Shortly thereafter, the City dismissed its third-party complaint without prejudice. The case proceeded without Arcadis as a party, and the company has not participated in this appeal.

Physical Conditions" clause (the DSC clause), which entitled it to additional payment for its expenses incurred because of unforeseen subsurface conditions. Plaintiff also contended it substantially complied with the contract's claim-notice provisions. The judge denied both motions, determining material disputed facts existed requiring a trial.

Shortly before trial, which took place before a different judge, plaintiff moved in limine to bar the City from introducing evidence of exculpatory provisions in the contract, some of which we discuss below. The judge denied the motion, concluding plaintiff essentially was seeking to relitigate the arguments it made when it sought partial summary judgment. The case proceeded to trial before a jury.

At the close of plaintiff's case, the City moved for a directed verdict. Plaintiff voluntarily dismissed its claims for unjust enrichment and quantum meruit, but otherwise opposed the motion. Although originally denying the motion, after additional briefing, the judge dismissed plaintiff's PPA claim, finding the statute did not apply to situations where the parties essentially disagreed about the claimant's entitlement to payment. After testimony on the defense case, the jury returned a no cause verdict in the City's favor on plaintiff's breach of contract claim.

4

Plaintiff moved for judgment notwithstanding the verdict (JNOV), or, alternatively, for a new trial. In a brief oral opinion, the judge denied the motion finding no miscarriage of justice.

Before us, plaintiff argues it was entitled to partial summary judgment as a matter of law, because: 1) the DSC clause reflects the parties' anticipation that the successful bidder could incur additional costs for undisclosed soil conditions; 2) pursuant to federal case law and P.T. & L. Construction Co. v. State of New Jersey Department of Transportation, 108 N.J. 539 (1987), contractual exculpatory clauses cannot trump a DSC clause; and, 3) plaintiff substantially complied with the contract's claim-notice provisions. Plaintiff also argues the judge erred in denying the in limine motion to exclude evidence at trial of the exculpatory clauses in the contract.

Plaintiff additionally contends the trial evidence did not support the verdict, or, alternatively, it is entitled to a new trial because evidence presented at trial regarding the exculpatory clauses "tainted the verdict by confusing the jury as to the law." Lastly, plaintiff argues the judge erred in dismissing its PPA claim.

We have considered the arguments in light of the record and applicable legal standards. We affirm.

A-1726-19

I.

"Whether a summary judgment motion is granted, denied, or granted in part and denied in part, an appellate court is limited to an examination of 'the original summary judgment record.'"  Noren v. Heartland Payment Sys., Inc., 449 N.J. Super. 193, 196 (App. Div. 2017) (quoting Lombardi v. Masso, 207 N.J. 517, 542 (2011)).  Our review of the motion judge's decision is de novo, applying the same standard as he did, which

> mandates that summary judgment be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
>
> [Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).]

A dispute of material fact is "genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact."  Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).  "Accordingly, when the movant is the plaintiff, the motion court must view the record with all legitimate inferences drawn in the defendant's favor and

6

decide whether a reasonable factfinder could determine that the plaintiff has not met its burden of proof." Globe Motor Co. v. Igdalev, 225 N.J. 469, 481 (2016).

In this case, plaintiff's partial summary judgment motion presented a legal issue, i.e., interpretation of the DSC clause and its purported primacy over other terms in the agreement. We consider such questions de novo, owing no deference to the motion judge's legal analysis or interpretation of a statute. Palisades At Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017) (citing Zabilowicz v. Kelsey, 200 N.J. 507, 512 (2009)).

Regarding the denial of plaintiff's in limine motion, we generally apply a deferential standard and "reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). "However, no deference is accorded when the court fails to properly analyze the admissibility of the proffered evidence." E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 25 (App. Div. 2018) (citing Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012)). In those situations, our review is de novo. Konop, 425 N.J. Super. at 401.

We agree with the trial judge that plaintiff's in limine motion merely recycled the same legal arguments plaintiff made when it moved for partial

summary judgment. In short, the same legal issue arose in both procedural contexts.

Resolution of plaintiff's arguments initially causes us to cite extensively the provisions of the contract documents, which were at the core of the City's motion for summary judgment. The RFB contained the Project Manual, which included the General Conditions (GC), Supplemental General Conditions (SGC), Supplemental General Conditions of the Engineer (SGC-E), a 2002 Geotechnical Report by Arcadis (Appendix A), and a 2006 Sample Data Report by Arcadis (Appendix B) (collectively, the reports). These documents, excluding the two Arcadis reports, were incorporated specifically into the contract, and only Appendix B was considered part of the bid documents.

The two appendices were central to plaintiff's claims. The 2002 Report in Appendix A included technical data derived from test borings at the site, and, in a synopsis, described the "[s]ubsurface conditions" as "consist[ing] of 9 to 17.5 feet of fill comprised of silty sand with gravel, brick, building debris, wood, and metal fragments." Below that was "a layer of silty clay and organic silt/clay 4.5 to 11.5 feet in thickness, followed by silty sand with gravel and silt."

Appendix B was a 2006 report of "soil sampling" performed by Arcadis's predecessor "to characterize the historic fill for transport and disposal." It

contained pages of technical data, as well as the consultant's "[c]onclusions and [r]ecommendations," including that "the historic fill material [at the site] [was] categorized as hazardous soil."

SGC-E §4.02(B) advised plaintiff it could "rely upon the general accuracy" of the technical data in the reports, but the reports were not "[c]ontract [d]ocuments." Plaintiff was further advised it "may not rely upon" the reports or "make any [c]laim against" Arcadis or the City based on "the completeness" of the reports, "other data, interpretations, opinions . . . in such reports," or any "conclusion drawn from any 'technical data' or any such . . . interpretations, opinions[,] or information." Similarly, §4.06, regarding "Hazardous Environmental Conditions at the Site," provided plaintiff could only rely on the general accuracy of the technical data in the reports and not on any opinions, interpretations or conclusions drawn from them.

However, §4.03 of the SGC-E, entitled, "Differing Subsurface or Physical Conditions" (the DSC clause), provided in relevant part that if plaintiff believed "any subsurface . . . condition at or contiguous to the [s]ite [was] uncovered or revealed," and the "'technical data' on which" it was "entitled to rely . . . [was] materially inaccurate," was of such nature "to require a change in the [c]ontract [d]ocuments," differed "materially from that shown . . . in the [c]ontract

9

[d]ocuments," or was "of an unusual nature and differ[ed] materially from conditions ordinarily encountered," it was not to disturb the subsurface conditions further and had to advise Arcadis and the City. Additional provisions called for the contract price or time for performance or both to be "equitably adjusted," subject to additional conditions and limitations.

Plaintiff's partial summary judgment motion relied on that provision and §11.2 of the GC (the concealed conditions clause), which Arcadis's project manager, Luigi Zecchin, acknowledged allowed for price adjustment based on concealed or unknown materially different conditions. That section of the GC provided:

> Should concealed conditions encountered in the performance of the Work below the surface of the ground . . . be at variance with the conditions indicated by the Contract Documents, or should unknown physical conditions below the surface of the ground . . . differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Contract, be encountered, the Contract Sum shall be equitably adjusted by Change Order upon claim by either party made within twenty days after the first observance of the conditions.

The contract documents repeatedly limited any reliance on the reports. Article 6.01 of the Project Manual said both reports were provided "for reference only," and while plaintiff could rely on the technical data contained within the

reports, it was "responsible for any interpretation or conclusion drawn from any 'technical data' or any other data, interpretations, opinions or information contained in such reports." Similarly, Article 6.03, regarding "Hazardous Environmental Conditions," stated Appendix B was provided "for reference only," and while plaintiff could rely on the technical data in the reports, it was "responsible for any interpretation or conclusion drawn from any 'technical data' or any other data, interpretations, opinions or information contained in such reports."

Article 6.05 allowed plaintiff to "conduct such examinations, investigations, explorations, tests, and studies . . . necessary for submission of a [b]id." The City set a time and date for a site visit by all bidders.[2] Article 6.09 provided that submission of a bid would serve as a representation that the bid documents contained sufficient information for plaintiff to form its bid, and that it complied with all requirements of Article 6:

> The submission of a Bid will constitute an incontrovertible representation by Bidder that Bidder has complied with every requirement of this Article 6, that without exception the Bid is premised upon performing the Work required by the Bidding Documents and applying any specific means, methods, techniques, sequences or procedures of construction

---

[2] It was later revealed at trial that plaintiff never sent a representative to the site visit.

A-1726-19

that may be shown or indicated or expressly required by the Bidding Documents, that Bidder has given [Arcadis] written notice of all conflicts, errors, ambiguities and discrepancies that Bidder has discovered in the Bidding Documents . . . and that the Bidding Documents are generally sufficient to indicate and convey understanding of all terms and conditions for performing the Work.

D-19 of the SGC, entitled "Subsurface and Physical Conditions," was a waiver of any claim against the City or Arcadis based on the bid documents:

It shall be understood and agreed that the Contractor will not use any of the information made available to him, or obtained in any examination made by him, in any manner as a basis or ground of claim or demand of any nature . . . arising from or by reason of any variance which may exist between the information offered and the actual materials . . . encountered during the construction.

It is understood and agreed that [the City and Arcadis] do not warrant or guarantee that the materials, [and] conditions . . . encountered during the construction will be the same as those indicated . . . in the Contract Documents. Each bidder must inform himself fully of the conditions relating to the construction and labor under which the work will be performed; and in particular as to subsurface and groundwater conditions; failure to do so will not relieve a successful bidder of his obligation to furnish material and labor necessary to carry out the provisions of the Contract documents and to complete the contemplated work for the considerations and he makes his bid with full knowledge of conditions, and the kind, quality, and quantity of the work required.

12

It is also understood and agreed that the Bidder or the Contractor will not use any of the information made available to him or obtained in any examination made by him, in any manner as a basis or ground of claim or demand of any nature against the [City or Arcadis], arising from or by reason of any variance which may exist between the information offered and the actual materials or structures encountered during construction.

Before plaintiff could begin excavation, Article 1.7 of the Project Manual required it to draft a Pre-Characterization Program Work Plan and Soil Management Plan (the Plan), setting forth its intended manner of excavation and disposal of hazardous and non-hazardous soil, and to submit them for approval to Zecchin. If the soil disposal facility plaintiff chose to use required additional testing to "sufficiently categorize all soil," Article 1.7B provided the testing, and any fee for equipment needed to conduct the testing, would be done "at no additional cost to [the City]."

Zecchin approved the Plan, which anticipated plaintiff would conduct twenty additional samplings from the project site and dispose of the excavated soils at three sites, only one of which accepted hazardous materials. In support of its motion for partial summary judgment, plaintiff claimed it encountered unanticipated subsurface materials as it tried to install a cofferdam and alleged these subsurface conditions were contrary to those represented in the reports. It

13

claimed that the Appendix A report indicated the absence of any obstructive material after a depth of ten feet, yet it encountered timber pilings and other debris that impeded its ability to install the cofferdam. It notified Zecchin of its intention to seek additional compensation for these allegedly unforeseen conditions.

Plaintiff also contended that early testing showed the non-hazardous soil was nonetheless close to limits the Department of Environmental Protection set for hazardous materials. Given the proximity between hazardous and non-hazardous soils at the site, plaintiff claimed the disposal facility it chose would not accept any soils as non-hazardous soils, and it became necessary for plaintiff to dispose of all excavated soils as if they were hazardous. Plaintiff argued that Appendix B recognized all historic fill was hazardous and needed to be disposed of as such. Ultimately, a facility in Pennsylvania agreed to accept the non-hazardous material, but plaintiff alleged at greatly increased costs. Plaintiff again cited these unforeseen circumstances to Zecchin and requested additional compensation.

In a June 15, 2012 letter, Zecchin denied plaintiff's request for additional payment, explaining the RFB documents notified bidders of the hazardous material at the site, estimated the amount of that material, and required the

14

successful bidder to identify and dispose of all hazardous material.  Zecchin noted that plaintiff had the opportunity to make any inquiries or raise any issues prior to submitting its bid and failed to do so.  Zecchin said the contract placed the risk of that failure on plaintiff, and it was necessary for it to continue to separate hazardous and non-hazardous materials for disposal.

Zecchin also reiterated, as he had in prior correspondence and discussions with plaintiff, that "the conditions at the site have not materially changed from those identified in the Contract Documents."  He requested plaintiff comply with the agreement, proceed to separate hazardous from non-hazardous soils, and dispose of them accordingly.  Additionally, Zecchin requested plaintiff comply with the formal claim-notice process set forth in the contract, which required submission of a claim within twenty days if it intended to continue to assert claims for additional compensation.

Although plaintiff served written notice of its intention to seek additional compensation through the fall of 2012 and into 2013, it did not request a change order to the contract until March 2013.  Citing increased costs and resulting delays in completing the project, plaintiff sought more than $1.6 million in additional compensation.

15

Plaintiff completed the work by February 2014. The City paid the full contract price, minus retainage of $197,860, because plaintiff failed to complete all close-out documents, including a final release and waiver of claims, required by the contract.

In denying plaintiff's motion for partial summary judgment, the judge reasoned there were material disputes whether the unanticipated subsurface conditions existed, whether plaintiff failed to reasonably anticipate these conditions, and whether it had complied with the claims-notice provisions of the contract.

Before us, plaintiff reiterates its claim that based on the undisputed facts in the summary judgment record, it was entitled to these additional sums as a matter of law under the DSC, without regard to the other exculpatory provisions of the contract. Plaintiff contends any other interpretation of the agreement would "undermine the stability within the construction industry [which] . . . rel[ies] on the use of the DSC clause in exchange for lower construction costs." In this regard, plaintiff primarily relies on the Court's decision in P.T. & L. Construction Co. and federal case law.

In P.T. & L. Construction Co., a contractor sued the State to recover payment for additional and allegedly unexpected expenses associated with the

construction of a bridge on Interstate 78 in Springfield. 108 N.J. at 542. "According to [the] plaintiff's witnesses, the job was plagued from the start by poor working conditions" and resulted in a completion date nearly two years later than expected. Id. at 543. Drainage was a major problem, and the plaintiff claimed that the State not only failed to disclose certain information relating to drainage at the site, but also misled and withheld material information from the plaintiff. Id. at 544–45. Relying on exculpatory provisions in the contract, the State claimed it was not liable for any additional expenses, and instead, the contractor was liable for liquidated damages because of the delay in completion. Id. at 544.

The Court began by discussing the "tension" that exists in public contracts because the lowest bidder is awarded the contract. Id. at 546–47. This promotes price competition, but the practice produces "an anomalous effect" by "forc[ing] both the contractor and the state to search intensively for means to protect, if not improve, their positions once the contract price is fixed and performance is begun." Id. at 547 (quoting Scott A. Livingston, Fair Treatment for Contractors Doing Business With the State of Maryland, 15 Univ. Balt. L. Rev. 215, 226–27 (1986) (footnotes omitted)).

While the contract did not contain a DSC clause, typical of State contracts at the time, the Court noted that federal government contracts usually included such clauses, id. at 548, and our State law on public contracts had "evolved on parallel lines" with federal jurisprudence, id. at 551. Referring to federal practice, the Court explained that a DSC clause "take[s] at least some of the gamble on subsurface conditions out of bidding" by giving the contractor "information on which they may rely in making their bids," while also "promis[ing] an equitable adjustment . . . if subsurface conditions turn out to be materially different than . . . indicated . . . ." Id. at 548 (quoting Foster Constr. C.A. & Williams Bros. v. United States, 435 F.2d 873, 887 (1970)).

The Court explained: "When the government makes a positive statement of fact about the character of work to be performed, upon which the contractor may reasonably rely, it is binding on the government notwithstanding the inclusion of exculpatory clauses in the contract." Id. at 548–49 (citing United States v. Spearin, 248 U.S. 132, 136–37 (1918)). "Nevertheless, the contractor must absorb expenses that would have been avoided if the contractor had been conscientious in its investigation." Id. at 549 (citing D. Federico Co., v. New Bedford Redevelopment Auth., 723 F.2d 122, 125 (1st Cir. 1983)).

18

After considering three decisions from our court, the Court summarized the applicable standard:

> [W]hen the State makes false representations it will be liable for damages resulting from them despite a general disclaimer of liability for inaccurate representations. However, if the disclaimer is sufficiently specific or <u>if the statements only purport to be the results of tests rather than being actual conditions or descriptions of actual conditions, then the contractor cannot recover</u>.
>
> [<u>Id.</u> at 553 (quoting <u>Ell-Dorer Contracting Co. v. State</u>, 197 N.J. Super. 175, 183 (App. Div. 1984) (emphasis added)).]

If the contract contains a DSC clause, "it is not necessary to find that the bidder was 'misled' or that the government 'concealed' information." <u>Id.</u> at 558 (quoting <u>United Contractors v. United States</u>, 368 F.2d 585, 597 n. 6 (Ct. Cl. 1966)). "It will suffice under that form of contract that the bidder did not expect or have reasonable cause to anticipate the underground conditions encountered." <u>Ibid.</u> But, if the contract "shifts to the bidder the burden of evaluating subsurface conditions," a higher standard is imposed. <u>Ibid.</u> Recovery may be barred "if no information to the contrary has been withheld" by the government, or the "bidder . . . [in]adequately investigated the site." <u>Ibid.</u> (quoting <u>Golomore Assocs. v. N.J. State Highway Auth.</u>, 173 N.J. Super. 55, 58 (App. Div. 1980)).

Justice O'Hern summarized the interplay of these principles at the very beginning of the Court's opinion by holding:

> [T]here is a sufficient factual basis to sustain the trial court's finding that the State's nondisclosure of material facts constituted a misrepresentation of site conditions for which recovery may be allowed. The general exculpatory clauses of the contract disclaiming responsibility for differing site conditions do not apply in the face of such a finding. We note, however, that had the plaintiff's claim been premised only on its conclusion that dry working conditions were implicit in the contract specifications, recovery would have been precluded by the specific disclaimers of State responsibility for site conditions. There is a critical distinction between a claim based on the State's implying that conditions would be dry and a claim founded on the State's withholding information that conditions would be wet.
>
> [Id. at 541–42.]

The Court fully recognized consideration of these issues involves resolution of factual disputes. Id. at 558–61.

It is obvious from the decision in P.T. & L. Construction Co. that a DSC clause and exculpatory clauses may validly co-exist in the same contract, and, contrary to plaintiff's continued assertions before us, whether a contractor is entitled to rely on the terms of the DSC clause for additional payment despite the existence of exculpatory clauses presents distinctly mixed questions of fact and law. Id. at 560. The motion judge correctly denied plaintiff's motion

20

because the undisputed facts did not establish that plaintiff was entitled to judgment as a matter of law. <u>Globe Motor Co.</u>, 225 N.J. at 481.

In the context of plaintiff's partial summary judgment motion, the DSC clause allowed for an adjustment to the price if plaintiff demonstrated as undisputed fact that a "subsurface . . . condition" at the site was "uncovered or revealed," and the "<u>'technical data' on which</u>" it was "<u>entitled to rely</u> . . . [was] materially inaccurate," was of such nature "as to require a change in the [c]ontract [d]ocuments," differed "<u>materially from that shown or indicated in the</u> <u>[c]ontract [d]ocuments</u>," or was "of an unusual nature[] and differ[ed] materially from conditions ordinarily encountered." Section 11.2 of the GC, the concealed conditions clause, required plaintiff to demonstrate as undisputed fact that subsurface conditions were "at variance with the conditions indicated by the [c]ontract [d]ocuments," or "differ[ed] materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this [c]ontract."

A question of fact existed as to whether the subsurface obstructions that delayed installation of the cofferdam, and the City's requirement that plaintiff separate all hazardous and non-hazardous material, including that which was historic fill, differed from the bid documents incorporated into the parties'

agreement. Plaintiff claimed that they did, but various provisions in the bid documents did not support its position.

The Project Manual disclosed that the site had been the location of warehouses, factories and other structures and that the contractor would be expected to remove "old uncharted foundations, rubble from former structures, timber piling[,] and concrete pipe, concrete pipe supports, [and] timber cribbing . . . that may contain debris such as tires, cinders, glass, ash, wood, metal and steel." Appendix A also told plaintiff that the soil comprised "9 to 17.5 feet of fill," which included "silty sand with gravel, brick, building debris, wood, and metal fragments." Whether this information adequately informed plaintiff of the nature of the subsurface conditions, so as to defeat its claim that the obstructions encountered in installing the cofferdam were unforeseen and materially different, presented disputed facts.

With respect to the City's requirement that plaintiff separate all hazardous material from non-hazardous material, plaintiff relied on Appendix B, which opined that all historic fill would have to be disposed of as hazardous material. However, various provisions in the Project Manual limited a bidder's reliance to only technical data contained in Appendix B. Moreover, the Project Manual required plaintiff to separate the soil into naturally deposited material and

22

historic fill, each of which would be further divided into hazardous and nonhazardous material, and to dispose of each in accordance with DEP regulations. The Plan submitted by plaintiff included separation of soil into these categories. Whether the City's insistence on separation of the excavated soil over plaintiff's objection was a material change in the terms of the agreement was a disputed fact.

In short, the motion judge correctly found there were material factual disputes foreclosing partial summary judgment in plaintiff's favor. See, e.g., SMC Corp. v. N.J. Water Supply Auth., 334 N.J. Super. 429, 435 (App. Div. 2000) (explaining whether a subsurface condition was "reasonably obtainable" or "ascertainable" so as to entitle the contractor to additional payment was an issue of fact).

In light of our discussion, plaintiff's contention that the trial judge erred by denying its motion in limine to exclude evidence of the exculpatory provisions of the contract lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Simply put, contrary to plaintiff's argument, the DSC clause did not render the exculpatory provisions of the agreement irrelevant at trial.

II.

Plaintiff contends the court erred in denying its motion for JNOV, see R. 4:40-2, on its breach of contract claim. It argues that it proved the City breached the agreement by failing to: adequately convey the nature of the historic fill and its intention to have plaintiff separate the hazardous material; disclose the nature of the subsurface materials, which complicated installation of the cofferdam; and pay plaintiff the outstanding contract balance of $197,860 held as a retainage. Plaintiff contends the trial evidence supporting its claims was essentially undisputed.

> When considering a motion for JNOV or a new trial, "[t]he trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law."
> [Barber v. ShopRite of Englewood & Assocs., Inc., 406 N.J. Super. 32, 51 (App. Div. 2009) (alteration in original) (quoting R. 4:49-1(a)); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:40-2 (2022) ("The standard for granting [JNOV] is essentially the same as that applicable to the grant of a new trial motion." (citing Barber, 406 N.J. Super. at 51–52)).]

"[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case

culminates in 'a clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521–22 (2011)). As a prerequisite to filing a motion for JNOV, the party must have filed a motion for judgment prior to or during trial; failure to do so will preclude the motion. Velazquez v. Jiminez, 336 N.J. Super. 10, 33 (App. Div. 2000).[3]

Because we write solely for the parties involved, we need not detail the substantial evidence at trial that supported the City's arguments, premised on the exculpatory language of the contract, which raised significant doubt about plaintiff's claims of material reliance on the information contained in the reports or deviations from representations made regarding subsurface conditions.

The evidence supported the jury's finding of no cause even as to the retainage. The City established that plaintiff never submitted the necessary documents for final payment, and plaintiff presented no evidence to the contrary. Indeed, plaintiff's vice-president, John Scannella, Jr., testified that he never

---

[3] The City contends plaintiff's claim for JNOV as to the retainage is procedurally barred because plaintiff's partial summary judgment motion was limited to liability, and plaintiff specifically asserted that the issue of damages required a trial. See Velazquez, 336 N.J. Super. at 33 ("Under Rule 4:40-2, a [JNOV] cannot be entered unless a motion for judgment or its equivalent has been made during trial." (citing Surkis v. Strelecki, 114 N.J. Super. 596, 599–600 (App. Div.1971))). We agree the claim in this respect was procedurally barred, but we address it anyway being convinced, as we explain, that it lacks any merit.

A-1726-19

signed a final release and waiver of claims, both of which the contract required plaintiff submit to receive full and final payment.

Plaintiff also contends it was error to deny its motion for a new trial, see R. 4:49-1(a), citing once again the judge's denial of its in limine motion, thereby permitting the City to introduce evidence and testimony regarding the exculpatory provisions, and also that the judge's final instructions confused the jury. These contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

## III.

Lastly, plaintiff argues the trial judge erred in granting a directed verdict on its PPA claim. As we discern the limited argument made in plaintiff's brief, it contends that Scannella testified plaintiff submitted its final invoice in January 2016 but it remained unpaid at the time of trial.

Rule 4:40-1 permits a party to move for a directed verdict at the close the opponent's evidence. Like the standard for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party," in this case, the City, "must prevail as a matter of law." Frugis v. Bracigliano, 177 N.J. 250, 269 (2003) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536

(1995)). On appellate review, "we apply the same standard that governs the trial courts." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (citing ADS Assocs. Grp., Inc. v. Ortiani Sav. Bank, 219 N.J. 496, 511 (2014)).

The PPA provides in relevant part:

> If a prime contractor has performed in accordance with the provisions of a contract with the owner and the billing for the work has been approved and certified by the owner or the owner's authorized approving agent, the owner shall pay the amount due to the prime contractor for . . . retainage monies not more than [thirty] calendar days after the billing date . . . specified in the contract.
>
> [N.J.S.A. 2A:30A-2(a) (emphasis added).]

"If a payment due pursuant to the provisions of this section is not made in a timely manner, the delinquent party shall be liable for the amount of money owed under the contract, plus interest at a rate equal to the prime rate plus 1%." N.J.S.A. 2A:30A-2(c).

In this case, the trial judge entered judgment in the City's favor reasoning the PPA did not apply because the parties disputed plaintiff's entitlement to payment of the retainage based on its failure to execute and return all necessary documents, as required by the contract. While we generally agree with this reasoning, the issue was raised in the procedural context that required the judge to accord all favorable inferences to plaintiff. However, as noted, plaintiff's own

27

vice-president acknowledged during his testimony on plaintiff's case-in-chief that the company failed to execute closing documents as required by the contract because it did not want to waive its right to bring this litigation. In other words, it was undisputed that plaintiff had not "performed in accordance with the provisions of a contract," N.J.S.A. 2A:30A-2(a), a predicate for recovery under the PPA.

We agree, therefore, that the judge properly granted a directed verdict in the City's favor on the PPA claim for the retainage, albeit for slightly different reasons than expressed by the trial judge. See Hayes, 231 N.J. at 387 (noting "it is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

Affirmed.[4]

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] In its reply brief, plaintiff for the first time asserts the judge erred in denying its motion for a "directed verdict." There is no record citation to the transcript in plaintiff's reply brief demonstrating that it ever made such a motion, and we saw none in our review. Regardless, it is inappropriate to raise an issue for the first time in a reply brief. See, e.g., L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs. Inc., 434 N.J. Super. 60, 87(App. Div. 2014) (determining that an argument raised for the first time in a reply brief is "deem[ed] . . . to have been waived").